## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW MEXICO

LYNDON NUTT,

       Plaintiff,

vs.                                                                  No. Civ. 24-203 GJF/JHR

CITY OF LAS CRUCES,
GABRIEL AGUIRRE, and
AARON SOLIS, in their individual
and official capacities,

       Defendants.

### <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER is before the Court on the City of Las Cruces, Officer Gabriel Aguirre, and Officer Aaron Solis's ("Defendants") Motion for Partial Summary Judgment No I: Dismissal of Plaintiff's Federal Constitutional Claim for Unreasonable Seizure on the Basis of Qualified Immunity [ECF 48] ("MPSJ No. I") and Motion for Partial Summary Judgment No. VII: Dismissal of Plaintiff's Americans with Disabilities Act Claims [ECF 55] ("MPSJ No. VII"), which are both fully briefed. ECFs 48, 55, 73, 75–76, 79, 85. Having thoroughly considered the filings, the record evidence, and the relevant law, the Court concludes that both motions are well-taken and should be **GRANTED**.

## I. BACKGROUND[1]

This case arises from a police response to a landscaping dispute. Juan Haro ("Mr. Haro"), a landscaper, allegedly blew dust towards Lyndon Nutt ("Mr. Nutt"), an elderly man working on

---

[1] The facts come from the Call for Service Detail Report [ECF 48-1 at 1–7 ("Ex. A")]; the Mesilla Valley Regional Dispatch Authority Audio [ECF 48 ("Ex. B")]; relevant Las Cruces Police Department reports [ECF 48-2 at 1–5 ("Ex. C")]; Officer Aguirre's body-worn camera ("BWC") [ECF 48 ("Ex. D")]; portions of Mr. Nutt's deposition transcript [ECF 48-3 at 1–3 ("Ex. E")]; Officer Solis's BWC [ECF 48 ("Ex. F")]; Officer Jesus Quinones's BWC [ECF 48 ("Ex. G")]; Officer Hayes's BWC [ECF 48 ("Ex. H")]; and other submissions made to the Court on the record. Exhibits B, D, F, G, and H were submitted to the Court in MP4 and MP3 format and cannot be viewed on CM/ECF. ECF 49.

his house next door. Mr. Nutt and Mr. Haro argued. Mr. Haro called 911 and accused Mr. Nutt of drawing a handgun during their argument. Officer Aguirre arrived on scene and spoke first with Mr. Haro and then with Mr. Nutt. Mr. Nutt appeared frustrated when speaking with Officer Aguirre. Officer Solis arrived on scene and ordered Mr. Nutt detained. Mr. Nutt resisted handcuffs, and the officers took him to the ground. Mr. Nutt was placed in the back of a Las Cruces Police Department ("LCPD") patrol unit while the officers investigated. LCPD never found a gun and Mr. Nutt was not charged with a crime.

Mr. Nutt sued in state court on January 22, 2024. ECF 1-1 (the "Complaint"). His Complaint included an unreasonable seizure claim pursuant to the Fourth and Fourteenth Amendments, two Americans with Disabilities Act ("ADA") claims on failure to accommodate and failure to train and supervise theories, and several state law claims. *Id.* Defendants removed the case to this Court on February 29, 2024. ECF 1. Mr. Nutt has proceeded pro se since January 2, 2025, when Judge Ritter allowed Mr. Nutt's counsel to withdraw. ECF 45.

On January 20, 2025, Defendants filed eight motions for partial summary judgment (the "MPSJs"). ECFs 48, 50–56. Together, the MPSJs seek dismissal of Mr. Nutt's case in its entirety.[2] *Id.* On February 4, 2025, Mr. Nutt responded to the MPSJs. ECFs 67–73, 75–76. In this Memorandum Opinion and Order, the Court limits its consideration to Mr. Nutt's <u>federal</u> claims,

---

[2] MPSJ No. VIII seeks dismissal of Mr. Nutt's claims to punitive damages under federal and state law. ECF 56. This Order dismisses with prejudice Mr. Nutt's federal claims and declines to exercise supplemental jurisdiction over his state law claims. Thus, the Court will not rule on MPSJ No. VIII.

which are at issue in Defendants' MPSJs Nos. I and VII.

### A. Undisputed material facts[3]

1.  On July 6, 2023, Mr. Nutt was an elderly man[4] who owned the house at 2030 Avalon Drive, Las Cruces, New Mexico ("2030 Avalon"). Ex. D (5:20–6:30); ECF 1-1 at 1 ¶¶ 1–2; Ex. C at 3; ECF 105-1 at 2–8.

2.  Officers Aguirre and Solis, non-defendant-Officers Quinones and Hayes, and non-defendant-Detective Contreras were employed by LCPD. ECF 1-1 at 2 ¶¶ 5–6; ECF 7 at 2–3 ¶¶ 5–6; Ex. C at 2–4.

3.  Mr. Haro was landscaping at 2020 Avalon Drive ("2020 Avalon"), next door to 2030 Avalon. Ex. B (0:00–0:27); Ex. D (1:30–4:40); MPSJ No. I Undisputed Fact (hereinafter "Defs' UF") 2. All relevant events occurred either at 2020 or 2030 Avalon. *See* Exs. B, D, F, G, and H.

4.  Mr. Haro called 911 at 11:12 a.m., and LCPD dispatched officers to 2020 Avalon. Ex. A at 1–2; Ex. B (0:00–0:27; 5:00–5:23); ECF 1-1 at 2 ¶ 11. Dispatch informed officers that a man drew a handgun and waved it at the caller. Ex. B (5:05–5:23); ECF 1-1 at 2 ¶ 11.

---

[3] The operative facts set forth in this section are (1) affirmatively admitted by the opposing party; (2) not "specifically controverted" by the opposing party, D.N.M.LR-Civ. 56.1(b); and/or (3) taken from the video evidence, with the Court "accept[ing] the version of the facts portrayed in the video, but only to the extent that it 'blatantly contradict[s]' [Plaintiff's] version of events," *Emmett v. Armstrong*, 973 F.3d 1127, 1131 (10th Cir. 2020) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Any dispute of fact between the parties not mentioned in this summary is one the Court considers immaterial. Mr. Nutt did not attach his own exhibits, but he noted that "[t]he audio/video recording[s] are key to this case" and cited to "[c]amera footage[.]" ECFs 73, 75.

Despite relying on the video recordings, Mr. Nutt contends that "[t]he edited footage . . . does not show a true picture of the event[,]" and he "requests that the entire footage be available to be presented to the court." ECF 91. Mr. Nutt admitted to possessing what he claims are the "original unedited videos" but failed to specifically controvert the video evidence submitted by Defendants. ECF 102-2 at 1. Moreover, no reasonable trier of fact could conclude that the BWC footage was edited. Mr. Nutt may be referring to Officer Aguirre unintentionally obscuring his BWC by pressing it against Mr. Nutt during the takedown. Ex. D (7:57–8:03). Even if Officer Aguirre acted intentionally, Officer Solis's BWC shows the takedown. Ex. F (2:10–2:25).

[4] Mr. Nutt told Officer Aguirre that he was eighty years old [Ex. D (6:23–6:28)], but medical documents show he was seventy-nine [ECF 105-1 at 2–8].

<u>Conversations with Mr. Haro and Mr. Nutt</u>

5.  Officer Aguirre arrived at 2020 Avalon at 11:16 a.m. and spoke with Mr. Haro, who identified himself as the caller and Mr. Nutt as the individual who drew the handgun. Ex. D (1:24–2:22); ECF 1-1 at 3 ¶ 13; Defs' UF 5. Mr. Haro told Officer Aguirre that Mr. Nutt drew a handgun during an argument, waved it at Mr. Haro, and pointed it upwards while standing feet away from him. Ex. D (2:16–2:21; 3:06–3:51). ECF 1-1 at 3 ¶ 16; ECF 7 at 4–5 ¶ 16; ECF 13 at 3; Defs' UF 6.

6.  Mr. Haro reported that he feared Mr. Nutt would use the handgun because Mr. Nutt frequently gets angry with the landscapers. Ex. D (2:27–2:46; 3:51–4:30).

7.  Only Mr. Haro and Mrs. Nutt witnessed this incident, but Mr. Haro told Officer Aguirre that Mrs. Nutt had already departed from 2030 Avalon. Ex. D (2:30–2:35); ECF 1-1 at 3 ¶ 18; ECF 75 at 1.

8.  From a distance, Officer Aguirre confirmed that Mr. Nutt did not possess any weapons before approaching. Ex. C at 2; Ex. D (4:51–5:17); ECF 1-1 at 3 ¶¶ 20–21.

9.  Mr. Nutt acted "in an erratic, uncooperative and confrontational manner" throughout his conversation with Officer Aguirre. *See* Defs' UF 10 (citing Ex. D (4:40–8:52); ECF 1-1 at 3 ¶ 23 (Mr. Nutt "was visibly bothered by the situation").[5]

10. Specifically, Mr. Nutt told Officer Aguirre that he "never liked [him] anyways" [Ex. D (5:27–5:33)]; Officer Aguirre addressed Mr. Nutt as "sir," to which Mr. Nutt responded, "don't call me sir. You don't have that honor." [Ex. D (5:31–5:38)]; Mr. Nutt began to sit down on his front porch, but he stood up when Officer Aguirre asked him to "do [him] a favor and sit down

---

[5] Mr. Nutt insists that during this conversation he acted "in a very calm and peaceful manner[;] he wasn't aggressive." ECF 73 at 1. This fact is not in genuine dispute because video evidence blatantly contradicts Mr. Nutt's version of events. *See* Ex. D (4:40–8:52).

and tell [him] what happened." [Ex. D (5:38–5:45)]; and Mr. Nutt used profanity [Ex. D (5:45–5:55; 6:20–6:34; 7:02–7:09); Defs' UF 11]. Mr. Nutt stepped towards Officer Aguirre, pointing his finger, and telling Officer Aguirre with a raised voice that he is complying with instructions. Ex. D (7:09–7:11). Officer Aguirre backed up and told Mr. Nutt to stop, to which Mr. Nutt stated that he did not need to stop because he was unarmed. Ex. D (7:11–7:15); Ex. F (1:32–1:35).[6] Officer Aguirre told Mr. Nutt to "have a seat," Mr. Nutt yelled "no," and kept walking towards Officer Aguirre with his arms extended to either side. Ex. D (7:15–7:17); Ex. F (1:35–1:37). Officer Aguirre told Mr. Nutt again to stop, to which Mr. Nutt yelled "no," and stepped towards Officer Aguirre. Ex. D (7:17–7:21); Ex. F (1:37–1:39). Mr. Nutt yelled at Officers Aguirre and Solis to shoot him if they draw their handguns. Ex D (7:21–7:25); Ex. F (1:42–1:45). Mr. Nutt muttered under his breath, to which Officer Aguirre told him that he needed to relax, and Officer Solis asked why he was so upset. Ex. D (7:25–7:38); Ex. F (1:47–1:57). Officer Aguirre told Mr. Nutt to sit on his front step, to which Mr. Nutt responded, "no sir. I don't take orders from people like you." Ex. D (7:38–7:45); Ex. F (1:57–2:05).

<u>Takedown of Mr. Nutt</u>

11. Officer Solis told Officer Aguirre to detain Mr. Nutt because he did not comply with officer commands. Ex. F (2:04–2:06); ECF 1-1 at 4 ¶ 29; ECF 13 at 3; ECF 75 at 1. Officer Solis told Mr. Nutt five times to put his hands behind his back. Ex. D (7:45–7:57); Ex. F (2:05–2:20); ECF 1-1 at 4 ¶ 28; Defs' UFs 20–21. Mr. Nutt resisted and grabbed hold of Officer Aguirre's handcuffs. Ex. D (7:48–8:15); Ex. F (2:08–2:20); Ex. E at 2; Defs' UFs 22–24.

12. Officer Solis told Officer Aguirre to get "him on the ground," and the two officers brought

---

[6] At this point, Officer Solis approached 2030 Avalon. Mr. Nutt asserts that "Officer Solis arrived at the scene [and] he ran up and started shouting orders to Mr. Nutt." ECF 75 at 1. This fact is not in genuine dispute because video evidence blatantly contradicts Mr. Nutt's version of events. *See* Ex. F (1:27–1:50).

Mr. Nutt to his stomach. Ex. F. (2:20–2:25). With Mr. Nutt on his stomach and continuing to resist, Officers Aguirre and Solis handcuffed him behind his back. Ex. D (8:03–8:27); Ex. F (2:25–2:50); Ex. E at 2; Defs' UF 28. Mr. Nutt twice requested that the officers not "put [his] hands backwards." Ex. D (8:24–8:35); Ex. F (2:43–2:55).

13. Officers Aguirre and Solis did not have a warrant prior to handcuffing Mr. Nutt. ECF 1-1 at 4 ¶ 30; ECF 7 at 6–7 ¶ 30.

<u>Detention of Mr. Nutt</u>

14. At Officer Hayes's directive, Officer Quinones placed Mr. Nutt in the backseat of Officer Aguirre's patrol unit while Officers Aguirre and Solis remained nearby. Ex. D (12:37–13:33); Ex. F (6:58–7:28); Ex. G (3:55–6:30); Ex. H (3:55–6:50); ECF 1-1 at 6 ¶ 52; ECF 7 at 8 ¶ 37. Mr. Nutt remained in the patrol unit during the investigation on a hot July day for roughly forty-five minutes. Ex. G (6:28–50:30); ECF 1-1 at 6 ¶ 52; ECF 7 at 8 ¶ 37. The patrol unit had the air conditioning running.[7] Ex. D (51:38–51:44); Ex. G (3:34–3:39; 4:23–4:26; 42:25–42:37); Ex. H (3:55–4:03); Defs' UF 38. Officers checked on Mr. Nutt multiple times, Officer Aguirre offered his water to Mr. Nutt, and Mr. Nutt spent ten minutes outside of the patrol unit while emergency medical technicians (EMTs) confirmed his good health. Ex. D (50:36–51:20; 55:48–56:45); Ex. G (15:46–26:27); Ex. F (19:05–21:32); Ex. H (16:04–26:50).

15. Officer Hayes requested a detective soon after Mr. Nutt was placed in the patrol unit, and detectives spoke with Mr. Nutt roughly forty minutes later. Ex. H (9:17–11:30); Ex. D (55:50–56:54).

---

[7] Defendants insist that the patrol unit had the air conditioning running. ECF 48 at 9–10 ¶ 38. BWC footage supports Defendants' position. *See* Ex. D (51:38–51:50); Ex. G (42:25–42:53). For his part, Mr. Nutt contends that he "was placed in a non-air conditioned unit" that "was not running[.]" ECF 67 at 2. The LCPD patrol unit holding Mr. Nutt can be heard running throughout his detention. *See* Exs. D, F, G, and H. Additionally, Mr. Nutt does not point to evidence from which a reasonable trier of fact could conclude that the patrol unit was not air conditioned. Thus, mindful of its duty to construe facts in the light most favorable to Mr. Nutt, the Court finds that it is undisputed that the patrol unit had the air-conditioning running. *See* D.N.M.LR-Civ. 56.1(b).

16. Officers denied Mr. Nutt's requests that his handcuffs be removed or loosened. *E.g.*, Ex. G (21:15–21:33; 26:05–26:25); ECF 1-1 at 6 ¶ 53. Mr. Nutt suffered minor cuts on his arms from the takedown and red bruises on his wrists from the handcuffs. Ex. D (9:13–9:23); Ex. G (50:54–51:00, 1:02:40–1:02:47; 1:05:03–1:05:13); ECF 1-1 at 4 ¶ 35.

17. Mr. Nutt was released without being charged with a crime because LCPD did not find a handgun on his person or in 2030 Avalon. Ex. D (13:20–13:23; 1:14:29–1:14:39); Ex. G (4:14–4:20). Ex. D (1:14:30–1:14:40); ECF 1-1 at 5 ¶¶ 40–41; ECF 7 at 8–9 ¶¶ 40–41.

18. Officer Aguirre remained on scene throughout Mr. Nutt's detention, and Officer Solis remained from the time of Mr. Nutt's detention until 12:05 p.m. Ex. D (7:45–1:14:25); Ex. F (2:04–44:45).

Mr. Nutt's Health[8]

19. Mr. Nutt struggled visibly with physical mobility due to his age. Ex. D (5:30–7:45); ECF 1-1 at 10–11 ¶ 83, 91; ECF 42-4 at 6; ECF 55-1 at 2–5.

20. After the takedown, Mr. Nutt told the officers that he was "sicker than a dog." Ex. D (9:39–9:41); Ex. F (3:59–4:01); Ex. G (0:35–0:37); Ex. H (0:55–1:00). Later, Mr. Nutt told Officer Quinones that he was a Vietnam Veteran.[9] Ex. G (19:32–19:37).

21. Mr. Nutt had a preexisting vertebrae injury, but other than joint and neck pain, he suffered

---

[8] Mr. Nutt argues that his hearing loss makes him disabled. *See, e.g.*, ECF 77. Maybe so, but Mr. Nutt's hearing loss is not a material fact because it occurred after the events in the Complaint. Indeed, the evidence before the Court is that the condition was first diagnosed on December 26, 2024, following a September 21, 2024 fall. ECF 57; ECF 55-1 at 2–3; ECF 77 at 5.

[9] The Complaint alleges that Mr. Nutt told the officers before the takedown that he was a Vietnam Veteran and that he suffered from "easily observable" "indicators of disabilities associated with being a military veteran[.]" ECF 1-1 at 3–4 ¶¶ 24–25. This fact is not in genuine dispute because video evidence blatantly contradicts Mr. Nutt's version of events. Mr. Nutt did not tell officers that he was a military veteran before he was detained. Moreover, a reasonable trier of fact could not conclude from the BWC footage that Mr. Nutt suffered from an easily observable military-associated disability. In any event, Mr. Nutt testified in his deposition that he suffered no injuries from his military service, [ECF 55-1 at 3 (21:5–10)], and he served in a non-combat military police role during the Vietnam War, [*see* ECF 42-4 at 6; ECF 111-2 at 2].

no medically relevant physical symptoms. ECF 42-4 at 9; ECF 105; *see* ECF 105-1 at 3 (listing symptoms that Mr. Nutt does not have); ECF 67 at 1 (Mr. Nutt "puts in long hours working on his projects").

22. Mr. Nutt has been treated for mental health conditions. *See* ECF 105-1 at 2; ECF 125 at 2; ECF 42-4 at 9 (Mr. Nutt's interrogatory response indicating that he was diagnosed with post-traumatic stress disorder following the events described in the Complaint). *But see* ECF 42-4 at 10 (admission that Mr. Nutt sought no treatment for mental illness in the ten years before filing his Complaint).

23. Mr. Nutt admitted that he is not disabled. *See* ECF 55-1, Ex. A; *see generally* ECF 55 at 3–4 ¶ 1 (collecting record evidence); ECF 64 (Mr. Nutt acknowledging that old age does not make him disabled). *But see* ECF 67 at 1 (Mr. Nutt stating that he prefers not to label himself disabled, but he suffers from "disabilities with hearing and strength").

## II.  APPLICABLE LAW

### A.  Summary Judgment Standard

On a motion for summary judgment, the moving party initially bears the burden of showing that no genuine issue of material fact exists. *Shapolia v. Los Alamos Nat'l Lab'y*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial. *Id.* The nonmoving party must go beyond the pleadings and must designate specific facts derived from admissible evidence (affidavits, depositions, answers to interrogatories, or admissions) that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995). Only disputes of facts that might affect the outcome of the

case will preclude the entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a reasonable trier of fact to return a verdict for that party. *See id.* at 248. A court will award summary judgment if the moving party is entitled to judgment as a matter of law based upon undisputed material facts. *See id.* at 247–48.

## B. Pro se Litigants

A court will "make some allowances for the pro se plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements." *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) (internal quotation omitted). A court will not, however, advocate for the pro se litigant, *Yang v. Archuleta*, 525 F.3d 925, 927 n.1 (10th Cir. 2008), by "construct[ing] arguments or theories for the plaintiff in the absence of any discussion of those issues," *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991).

## C. Qualified Immunity

Under 42 U.S.C. § 1983, any person acting under color of state law who "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." Nevertheless, in "[b]alancing the purposes of § 1983 against the imperatives of public policy," the Supreme Court has held that "police officers are entitled to a qualified immunity protecting them from suit." *Nixon v. Fitzgerald*, 457 U.S. 731, 746 (1982) (emphasis added).

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting

*Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 577 U.S. at 12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). This standard gives government officials space to make reasonable but mistaken judgments. *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015)). A defendant's assertion of qualified immunity creates a presumptive immunity from suit. *Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016).

When a defendant invokes qualified immunity at the summary judgment stage, the burden shifts to the plaintiff. *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016). "Thus, at summary judgment, [the Court] must grant qualified immunity unless the plaintiff can show (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Id.* at 900-01 (quoting *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014)).

## III. PRIMARY ARGUMENTS[10]

### A. Unreasonable Seizure

In MPSJ No. I, Defendants contend that Officer Aguirre initiated a lawful investigative stop justified by a reasonable suspicion that Mr. Nutt had committed aggravated assault. ECF 48 at 15–16. Additionally, Defendants argue that Officers Aguirre and Solis lawfully used handcuffs for officer safety and to complete their investigation. *Id.* at 16–18. Defendants insist that the amount of force used to handcuff Mr. Nutt was objectively reasonable. *Id.* at 18–24. Next, Defendants posit that Officers Aguirre and Solis did not personally participate in placing Mr. Nutt in the patrol unit. *Id.* at 24–25. Finally, Defendants claim entitlement to qualified immunity

---

[10] Mr. Nutt has presented additional arguments that the Court does not address within this Order. *See, e.g.*, ECF 64 (motion for appointed counsel); ECF 65 (motion for change of venue); ECFs 110 and 113 (allegations that Defendants' attorney has slandered Mr. Nutt); ECF 125 (motion requesting sanctions). This Order is limited to issues of federal law raised in MPSJs Nos. I and VII.

because if Officers Aguirre and Solis violated Mr. Nutt's constitutional rights, those rights were not clearly established under reasonably similar circumstances. *Id.* at 25–27.

Construing his response liberally, the Court understands Mr. Nutt to assert that he complied with Officer Aguirre's request to lift his shirt to show that he did not have a gun. ECF 75 at 1. Mr. Nutt insists that "Officer Solis arrived at the scene[ and] he ran up and started shouting orders to Mr. Nutt" that he could not understand or comply with. *See id.* Mr. Nutt observes that Officer Aguirre did not inform Officer Solis of what he and Mr. Nutt already discussed. *Id.* Mr. Nutt acknowledges that Officer Solis ordered a takedown because Mr. Nutt was not complying with his demands. *Id.*

**B. Americans with Disabilities Act**

In MPSJ No. VII, Defendants argue that Mr. Nutt is not a qualified individual with a disability because age is not a disability, and Mr. Nutt admits that he has no disability other than his age. ECF 55 at 6–11. As to Mr. Nutt's ADA failure-to-train claim, Defendants point out that the Tenth Circuit has not expressly recognized such a claim, and in any event, Mr. Nutt provided no evidence of deliberate indifference *Id.* at 11–13.

Construing his response liberally, the Court understands Mr. Nutt to argue that he "ha[s] disabilities with hearing and strength" but he "doesn't like to admit it[.]" ECF 73 at 1. Mr. Nutt

speculates that the LCPD needs to train its officers on how to interact with senior citizens, who need time to process officer commands in stressful situations. *Id.* at 2.[11]

## IV. ANALYSIS

There being no genuine dispute of material fact, the Court will now explain why Defendants are entitled to judgment as a matter of law on Mr. Nutt's unreasonable seizure and ADA claims. The Court will then explain why it declines to exercise supplemental jurisdiction over Mr. Nutt's remaining state law claims.

### A. Defendants are entitled to judgment as a matter of law on Mr. Nutt's unreasonable seizure claim.

The Fourth Amendment governs the legality of police/citizen encounters, and it protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.[12] "The Fourth Amendment does not forbid all or even most seizures—only unreasonable ones." *Torres v. Madrid*, 592 U.S. 306, 325 (2021). The law recognizes three types of police/citizen encounters: consensual encounters, investigative stops, and arrests. *Soza v. Demsich*, 13 F.4th 1094, 1099 (10th Cir. 2021). Only the latter two are seizures that implicate the Fourth Amendment. *See id.*; *United States v. Mosely*, 743 F.3d 1317, 1323–25 (10th Cir. 2014). To determine whether a seizure was reasonable, courts balance the individual's Fourth Amendment interests against the government's interests from the perspective of a reasonable police officer. *Lundstrom v. Romero*, 616 F.3d 1108, 1119–20 (10th Cir. 2010).

---

[11] Defendants did not file a reply brief as to either MPSJ, insisting that Mr. Nutt's responses did not comply with the Local Rules. ECF 79 at 2; ECF 85 at 2. The Court agrees, but it forgives Mr. Nutt's error as part of its obligation to liberally construe pro se filings.

[12] "[A] Fourth Amendment claim against New Mexico officers is also a Fourteenth Amendment claim, because that is the amendment that incorporates the Fourth Amendment's protections against the states." *Mondragon v. Thompson*, 519 F.3d 1078, 1082 n.3 (10th Cir. 2008). The Court "avoid[s] this terminology here to reduce confusion." *Id.*

Defendants concede that Officer Aguirre's encounter with Mr. Nutt began as a seizure. That is, they insist that it was a lawful investigative stop without arguing that it was a consensual encounter. *See* ECF 48 at 15–16. Thus, MPSJ No. I turns not on whether or when Mr. Nutt was seized, but on whether that seizure was reasonable.

In this section, the Court will explain why (1) Officer Aguirre's initial seizure of Mr. Nutt by way of an investigative stop was reasonable; and (2) Officers Aguirre and Solis's use of force against Mr. Nutt was reasonable.

1. <u>Officer Aguirre's investigative stop of Mr. Nutt was reasonable.</u>

An officer may make an investigative stop—a temporary seizure of limited scope and duration—to investigate possible criminal behavior when the officer lacks probable cause to make an arrest. *See United States v. Daniels*, 101 F.4th 770, 776 (10th Cir. 2024) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). To be reasonable, an investigative stop must be (1) justified at its inception; and (2) "reasonably related in scope to the circumstances which justified" the stop. *Daniels*, 101 F.4th at 776 (quoting *United States v. Madrid*, 713 F.3d 1251, 1256 (10th Cir. 2013)); *Lundstrom*, 616 F. 3d at 1120). The Court will now explain why (1) Officer Aguirre's investigative stop of Mr. Nutt was justified at its inception; and (2) it was not clearly established that Officer Aguirre and Solis's decision to use force was unreasonable in relation to the stop's scope.

a. *Officer Aguirre's investigative stop of Mr. Nutt was justified at its inception because it was supported by reasonable suspicion.*

An investigative stop is justified at its inception when it is supported by reasonable suspicion. *Daniels*, 101 F.4th at 776. Reasonable suspicion exists if an officer has "a particularized and objective basis for suspecting legal wrongdoing" based upon the totality of the circumstances. *Cortez v. McCauley*, 478 F.3d 1108, 1123 (10th Cir. 2007) (en banc) (internal quotation marks omitted) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Reasonable suspicion

13

requires more than a hunch, *Arvizu*, 534 U.S. at 274, but it exists if the officer could point to specific facts that give an objective impression that the person stopped has engaged in criminal activity, *Daniels*, 101 F.4th at 776. An in-person statement from an alleged crime victim seeking assistance can provide reasonable suspicion. *See Donahue v. Wihongi*, 948 F.3d 1177, 1189 (10th Cir. 2020); *United States v. Sanchez*, 519 F.3d 1208, 1213–14 (10th Cir. 2008).

In New Mexico, criminal assault is committed by "threat or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery[.]" N.M. Stat. Ann. § 30-3-1(B); *see New Mexico v. Branch*, 2018-NMCA-031, ¶¶ 12–18, —N.M.—, 417 P.3d 1141 (reasoning that defendant need not intend to assault the victim but must do an unlawful act that caused the victim to reasonably fear an imminent battery). Assault becomes aggravated when a deadly weapon, such as a handgun, is not merely possessed but is used in a threatening manner. *See* N.M. Stat. Ann. § 30-3-2(A); *New Mexico v. Zacharia G.*, 2021-NMCA-036, ¶ 15, —N.M.—, 495 P.3d 537.

Here, Officer Aguirre had reasonable suspicion to believe that Mr. Nutt had committed aggravated assault. *See Daniels*, 101 F.4th at 776; N.M. Stat. Ann. § 30-3-2(A). Dispatch and Mr. Haro informed Officer Aguirre that Mr. Nutt drew a handgun and waved it at Mr. Haro. UFs 4, 5. Mr. Haro explained to Officer Aguirre that Mr. Nutt used the handgun in a threatening manner by drawing it, waving it at Mr. Haro, and pointing it upward while standing feet away from him during an argument. UF 5. Additionally, Mr. Haro effectively communicated to Officer Aguirre that Mr. Nutt's conduct caused him to reasonably fear an immediate battery because Mr. Nutt had confronted Mr. Haro and the landscapers previously.[13] UF 6. Because dispatch and Mr. Haro's

---

[13] The Complaint implies that Mr. Haro is untrustworthy because, unlike Mr. Nutt, he has a criminal record. ECF 1-1 at 3, 5 ¶¶ 17, 38. While the law uses a criminal record as a proxy for trustworthiness in some instances, *see generally* Fed. R. Evid. 609 (allowing the use of certain criminal convictions to impeach witness testimony), statements from those with criminal records are not so untrustworthy as to negate reasonable suspicion. Police responding to a crime

statements support reasonable suspicion, Officer Aguirre had no obligation to question the other

eyewitness, Mrs. Nutt, who had already departed from 2030 Avalon. UF 7.

Mr. Nutt observes that LCPD never found the gun necessary to charge him with aggravated

assault, and he argues that Officers Aguirre and Solis intended to harass and intimidate Mrs. Nutt

and himself. *See, e.g.*, ECF 73 at 2; ECF 128-14 at 2 (Ex. N); ECF 128-36 at 1 (Ex. JJ). These

facts, however, do not negate reasonable suspicion. Reasonable suspicion can exist even without

an accompanying criminal charge. *See United States v. Rodriguez*, 739 F.3d 481, 486 (10th Cir.

2013) (quoting *Reid v. Georgia*, 448 U.S. 438, 441 (1980) (per curiam)). And reasonable suspicion

is an objective standard that does not consider an officer's subjective motivation. *United States v.*

*Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009).

> b. *Officers Aguirre and Solis are entitled to qualified immunity because the law*
> *does not clearly establish that the decision to use force was unreasonable in*
> *relation to the circumstances justifying the stop.*

To be reasonable, an investigative stop must also be reasonably related in scope to the

circumstances justifying the stop. *Daniels*, 101 F.4th at 776. Officers may take steps that are

reasonably necessary to protect themselves and bystanders, or to maintain the status quo, during

investigative stops without exceeding the scope of the stop. *United States v. Melendez-Garcia*, 28

F.3d 1046, 1051 (10th Cir. 1994); *United States v. Merkley*, 988 F.2d 1062, 1064 (10th Cir. 1993).

One such step is to use force, including handcuffs. *E.g.*, *Soza*, 13 F.4th at 1101. Force is lawful

during an investigative stop only if police officers have an articulable basis to suspect a threat to

themselves, bystanders, or the status quo; otherwise, the investigative stop becomes an arrest, for

which probable cause is required. *See id.* at 1103–04; *Lundstrom*, 616 F.3d at 1120–21. Officers

can reasonably decide to use force to carry out an investigative stop when "the facts available to

---

scene have discretion to judge witness credibility when conducting interviews to determine reasonable suspicion. *See*
*Sanchez*, 519 F.3d at 1213. Here, Officer Aguirre was best suited to judge Mr. Haro's credibility.

the officer at the moment of the [stop] warrant a man of reasonable caution in the belief that the [use of force] was appropriate" *E.g.*, *Soza*, 13 F.4th at 1101 (internal quotation marks omitted) (quoting *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968)); *see United States v. Albert*, 579 F.3d 1188, 1194 (10th Cir. 2009) (collecting cases where the Tenth Circuit found reasonable the use of handcuffs during an investigative stop).

Plaintiffs face a high bar when qualified immunity is applied to this fact-specific, objective standard. *See Soza*, 13 F.4th at 1101–04. Courts consider the need for split-second decision making, judging the decision to use force from the perspective of a reasonable officer without applying bright-line standards. *See United States v. Mosley*, 743 F.3d 1317, 1329 (10th Cir. 2014); *Merkley*, 988 F.2d at 1064. Thus, defendants alleged to have unreasonably decided to use force during an investigative stop are entitled to qualified immunity unless "all reasonable police officers in these circumstances [would] have known that the forceful measures used here were clearly <u>unreasonable</u> (thereby requiring probable cause) predicated upon existing clearly established law[.]" *Soza*, 13 F.4th at 1101 (emphasis in original).

In *Soza v. Demsich*, the Tenth Circuit applied the second prong of the qualified immunity analysis to a claim that officers unreasonably decided to use force. *See* 13 F.4th at 1101–04. There, police officers drew firearms and handcuffed the plaintiff, who resembled the suspect of a recently completed home invasion, on his porch. *Id.* at 1098. The court held that the defendant-officers were entitled to qualified immunity because the decision to use force was not clearly unreasonable. *Id.* at 1101. Three reasons supported the court's holding. *Id.* at 1101–04.

*First*, the facts went both ways as to whether the plaintiff presented a threat to the defendants. *Id.* at 1102. On one hand, the plaintiff "was calm, did not resist, did not make threatening movements, and the 911 call did not mention weapons, nor did the Officers initially

observe any." *Id.* at 1102. But the officers responded to a priority 911 call, the plaintiff matched the description of the suspect and was the only person in the vicinity, and specific facts of the alleged crime (smashing a glass door and following victims into a bedroom) suggested a high likelihood of violence. *Id.* The court held that the decision to use force was not clearly unreasonable. *See id.* at 1101. The court reasoned that some facts provided a reasonable, articulable ground to suspect that the plaintiff posed a danger. *See id.* at 1102. Thus, even if the defendant-officers acted unreasonably, their actions were not plainly incompetent because reasonable officers in their positions could have thought force was necessary for their safety. *See id.*[14]

*Second*, on-point precedent did not clearly establish the defendants' conduct as unreasonable. 13 F.4th at 1102–04 The court observed that in most instances the decision to use force only becomes unreasonable when officers lack corroborating evidence that a crime was committed or had no reason to suspect the plaintiff was dangerous. *Id.* at 1103 (collecting cases).

*Third*, the law could not have been clearly established because it was not beyond debate. *Id.* at 1104. The court observed the struggle in the parallel criminal case to weigh the plaintiff's relaxed demeanor against the likelihood that he was a violent burglar. *Id.*

Using *Soza* as a guide, the Court holds that Officers Aguirre and Solis are entitled to qualified immunity under the second prong as to their decision to use force to carry out their investigative stop of Mr. Nutt because their actions were not plainly incompetent. *See Soza*, 13 F.4th at 1101–04. Like in *Soza*, facts go both ways as to whether Officers Aguirre and Solis[15]

---

[14] In contrast to *Soza*, the Tenth Circuit found that police officers unreasonably decided to use force during an investigative stop in *Lundstrom v. Romero*. 616 F.3d at 1122. There, officers responded to a 911 call for child abuse and handcuffed a plaintiff as part of an investigative stop. *Id.* at 1115. The court held that the decision to handcuff that plaintiff was unreasonable because the officers did not first speak with the plaintiff, the plaintiff was neither threatening nor uncooperative, and the plaintiff posed no threat to the officers or the public. *See id.* at 1123.

[15] Having arrived minutes apart from one another, Officers Aguirre and Solis knew slightly different sets of facts at the time Officer Solis gave the command to detain Mr. Nutt. And the knowledge of one cannot be imputed to the other under the collective knowledge doctrine because Officer Aguirre and Solis did not share information prior to detaining

needed to use force to maintain the status quo during their investigation. *See Id.* at 1101–02; *Lundstrom*, 616 F.3d at 1123. On one hand, the officers responded to a 911 call indicating that a suspect—confirmed on scene to be Mr. Nutt—drew a handgun, suggesting a high likelihood of violence. UFs 4, 5. Additionally, Mr. Nutt was neither calm nor cooperative, defied both officers' authority and commands, and made threatening movements. UFs 9, 10. On the other hand, Mr. Nutt posed a minimal threat to the officers or the public because of his age and lack of a weapon. UFs 8, 19. Thus, while facts go both ways, some reasonable officers in Officers Aguirre and Solis's positions could have thought force was necessary to maintain the status quo pending their investigation.

Additionally, on-point precedent did not clearly establish beyond debate that Officers Aguirre and Solis's decision to use force was unreasonable. *See Soza*, 13 F.4th at 1102–03. Mr. Nutt has not identified, and the Court has not found, binding on-point precedent that put Officers Aguirre and Solis on notice that their decision to use force violated clearly established law. The most similar case that the Court could find is *United States v. Merkley*, and, as Defendants recognized [*see* ECF 48 at 26], it supports finding Officers Aguirre and Solis's decision to be reasonable. *See Merkley*, 988 F.2d at 1063–64. In *Merkley*, defendant-officers responded to calls that a man sitting in parked car was slamming the steering wheel, threatening to kill someone, and yelling at a passenger. 988 F.2d at 1063. The officers saw the suspect engage in similar conduct once on scene. *Id.* The officers approached the car with their hands on their firearms and handcuffed the suspect immediately. *Id.* The Tenth Circuit held that the officers reasonably decided to use force. *Id.* at 1063–64. The court reasoned that the officers' decision was reasonable because

---

Mr. Nutt. *See United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008). Officer Solis, however, would have received the dispatch informing him of the crime, and he observed Mr. Nutt's erratic, defiant behavior. UFs 4, 10. Thus, Officer Solis's late arrival does not impact the Court's analysis.

they responded to a call that the suspect was threatening to kill someone while acting violently, and the officers verified the suspect's violent behavior on scene. *See id.* at 1064.

Similarly, here, Officers Aguirre and Solis responded to a call that Mr. Nutt was acting violently. *See* UF 4. Officers Aguirre and Solis verified Mr. Nutt's violent and erratic behavior on scene. *See* UF 9, 10. Thus, far from clearly establishing beyond debate that Officers Aguirre and Solis decided unreasonably to use force to carry out the investigative stop of Mr. Nutt, *Merkley* supports finding their decision reasonable. *See Merkley*, 988 F.2d at 1063–64.

Construing the facts in the light most favorable to Mr. Nutt, the Court nevertheless concludes that Officer Aguirre initiated an investigative stop that was justified at its inception based on reasonable suspicion that Mr. Nutt had committed aggravated assault. The Court further concludes that it was not clearly established that Officer Aguirre and Solis exceeded the scope of that investigative stop when they decided to use force to detain Mr. Nutt. A reasonable trier of fact could not conclude otherwise; therefore, Defendants are entitled to judgment as a matter of law on the claim that the investigative stop of Mr. Nutt was unreasonable.

2. Officers Aguirre and Solis's detention of Mr. Nutt was reasonable because they did not use excessive force when they handcuffed Mr. Nutt or when they placed him in the patrol unit.

Having determined that reasonable suspicion supported the investigative stop, and the decision to use force did not exceed the stop's scope, the Court must now determine whether the amount of force used made the stop an unreasonable seizure. In this section, the Court will explain why Officers Aguirre and Solis neither (1) used excessive force when they took down and handcuffed Mr. Nutt; nor did they (2) violate Mr. Nutt's Fourth Amendment rights under a failure to intervene theory after Officer Quinones placed Mr. Nutt in the patrol unit.

        *a. Officers Aguirre and Solis did not use excessive force when taking down and handcuffing Mr. Nutt because the amount of force was reasonable and proportionate in response to Mr. Nutt's resistance.*

While the right to make an investigative stop confers a right to use force, that right is not unlimited. *Graham v. Connor*, 490 U.S. 386, 395–96 (1989). The use of force becomes an unreasonable seizure under the Fourth Amendment when it is excessive in relation to the force reasonably necessary under the circumstances to carry out a lawful detention. *Cortez*, 478 F.3d at 1126. The *Graham* factors guide the balancing of force used against force reasonably necessary: (1) "the severity of the crime at issue," (2) "whether the suspect pose[d] an immediate threat to the safety of the officers or others," and (3) "whether [the suspect was] actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *Cruz v. City of Deming*, 138 F.4th 1257, 1267 (10th Cir. 2025).

The first *Graham* factor asks whether the crime at issue is severe. *Graham*, 490 U.S. at 396. A felony is a severe crime. *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021) (collecting cases). Under New Mexico law, aggravated assault with a deadly weapon is a felony. *Cruz*, 138 F.4th at 1267. As discussed, Officers Aguirre and Solis had reasonable suspicion that Mr. Nutt had committed aggravated assault. Accordingly, the Court finds the first factor to weigh in Officers Aguirre and Solis's favor.

The second and most important *Graham* factor asks whether the suspect poses an immediate threat to the safety of the officers or others at the time force was used. *Graham*, 490 U.S. at 396; *Est. of Waterhouse v. Direzza*, 129 F.4th 1212, 1223 (10th Cir. 2025). When the suspect is unarmed, courts consider as sub-factors the suspect's (1) compliance with or hostility towards officer commands; (2) seeming willingness to use violence against the officers or others; and (3) capability to cause imminent severe bodily harm. *Direzza*, 129 F.4th at 1223. On one hand, Mr.

Nutt failed to comply with and showed hostility towards officer commands by refusing to sit down when asked, using profanity, advancing towards Officer Aguirre despite being told to stop, telling Officer Aguirre that he did not take orders from people like him, and by refusing to put his hands behind his back. UFs. 9–11. Additionally, Mr. Nutt's erratic, uncooperative, and confrontational behavior combined with his yelling at the officers to shoot him made him seem more willing to use violence [UFs 9–10]. On the other, Mr. Nutt's age, physical immobility, and lack of a weapon likely made him incapable of causing imminent severe bodily harm. UFs 1, 8, 19. Accordingly, the Court finds the second factor to weigh slightly in Officers Aguirre and Solis's favor.

The third *Graham* factor asks whether the suspect resisted detention. *Graham*, 490 U.S. at 396. Mr. Nutt resisted detention by refusing five commands to place his hands behind his back and holding Officer Aguirre's handcuffs. UF 11. Accordingly, the Court finds the third factor to weigh in Officers Aguirre and Solis's favor.

In sum, under the *Graham* factors and considering the facts in the light most favorable to Mr. Nutt, no reasonable trier of fact could conclude that Officers Aguirre and Solis acted unreasonably when they took down and handcuffed Mr. Nutt. While Mr. Nutt posed little physical threat, he was accused of committing a violent crime and defied officer commands.[16] Moreover, the officers used a minimal degree of force to detain Mr. Nutt, and that degree of force was appropriately tailored to the circumstances.[17]

---

[16] The Court understands Mr. Nutt to assert a right to defy officer commands that he deemed unlawful. *See* ECF 1-1 at 4 ¶ 27 ("[Mr. Nutt] correctly informed [Officer] Aguirre that [Mr. Nutt] was not legally obligated to follow [Officer] Aguirre's order to sit down"); ECF 73 at 2 (Mr. Nutt explaining that he did not have to comply with Officer Solis's commands because he showed Officer Aguirre that he possessed no weapons and "he was the truly injured party"). The law does not recognize such a right.

[17] While the issue was not explicitly raised, Mr. Nutt can be heard complaining to the officers about his handcuffs being too tight. UF 16. Failure to loosen handcuffs can amount to a Fourth Amendment violation if actual injury results. *Cortez*, 478 F.3d at 1129. Red marks left by handcuffs that last a few days are not an actual injury. *Id.* Mr. Nutt informed the officers that his handcuffs were too tight. But the only record evidence of injury attributed to tight handcuffs is red marks on Mr. Nutt's wrists. *See* UF 16. In the absence of actual injury, Defendants are entitled to summary judgment on a Fourth Amendment claim related to the use of handcuffs.

Even if the Court found that Officers Aguirre and Solis violated the Fourth Amendment by taking down and handcuffing Mr. Nutt, they did not violate clearly established law. It is clearly established that an officer violates a suspect's Fourth Amendment rights by taking down and handcuffing a suspect when the suspect complies with officer commands and does not resist detention. *See Jordan v. Jenkins*, 73 F.4th 1162, 1174 (10th Cir. 2023) (applying *Morris v. Noe*, 672 F.3d 1185, 1190 (10th Cir. 2012)). Here, Mr. Nutt did not comply with officer commands and instead resisted detention. UFs 10–11. Mr. Nutt has not identified, nor has the Court found, on-point precedent that clearly establishes that officers violate a suspect's Fourth Amendment rights when they take down and handcuff a physically unthreatening suspect accused of a serious crime who does not comply with officer commands and resists arrest. Accordingly, Defendants are entitled to judgment as matter of law on Mr. Nutt's claims that Officers Aguirre and Solis unreasonably seized him when they took him down and handcuffed him.

> b.  *Officers Aguirre and Solis did not unreasonably fail to intervene when Officer Quinones placed Mr. Nutt in the patrol unit because it was reasonable under the circumstances to place Mr. Nutt in the patrol unit.*

Forcing a suspect to remain in an unventilated car for a prolonged period may constitute an unreasonable seizure under an excessive force theory. *See Burchett v. Kiefer*, 310 F.3d 937, 945 (6th Cir. 2002) (citing *Hope v. Pelzer*, 536 U.S. 730 (2002)); *Crocker v. Beatty*, 995 F.3d 1232, 1250–52 (11th Cir. 2021) (applying *Kingsley v. Hendrickson*, 576 U.S. 389 (2015)); *Little v. Gore*, 148 F. Supp. 3d 936, 951 (S.D. Cal. 2015) (collecting cases) ("the case law suggests that a brief (e.g., 30–minute–long) confinement in a hot patrol car does not violate the Fourth Amendment, but an extended (e.g., four-hour-long) confinement in a hot police car does" (internal citation omitted)).

Circuit courts have applied Fourth Amendment principles to hot car theories of unreasonable seizure on at least two occasions. First, in *Burchett*, the defendant-officers detained the plaintiff for three hours in a patrol unit without the engine running and the windows rolled up on a ninety-degree day. 310 F.3d at 940. The defendants denied the plaintiff's request for fresh air. *Id.* The Sixth Circuit held that the defendants who knew of the heat and the length of the plaintiff's detention violated the plaintiff's Fourth Amendment rights. *Id.* at 946. Balancing the plaintiff's Fourth Amendment interest in being free from an unreasonable seizure against the government's interest in effecting the seizure, the court reasoned that the defendants lacked justification for detaining the plaintiff in extreme heat for so long. *See id.* at 945. Critically, the defendants had equally effective means to detain the plaintiff, such as rolling the windows down or turning on the air-conditioning. *See id.* The court observed that it would be reasonable to roll the windows up if the plaintiff was disrupting the search. *See id.* The facts before the court thus demonstrated that the defendants unreasonably seized the plaintiff. *See id.* at 945–46.

Conversely, in *Crocker*, the defendant-officer detained the plaintiff for between twenty-two and thirty minutes in a patrol unit without air-conditioning on an eighty-four-degree day. 995 F.3d at 1238. When the plaintiff asked for air and told the officer he felt as if would die, the defendant told him that his detention was not meant to be comfortable. *Id.* The Eleventh Circuit held that the defendant's conduct was not objectively unreasonable. *Id.* at 1250. The court reasoned that being placed in a hot car for less than thirty minutes intruded minimally into the plaintiff's constitutionally protected interests, and he sought no medical attention for heat-related illness. *See id.* 1250–52.[18] The facts before the court thus demonstrated that the defendant did not unreasonably seize the plaintiff. *See id.*

---

[18] The Eleventh Circuit analyzed this claim under the Fourteenth Amendment, but the analysis would not change under the Fourth Amendment. *Crocker*, 995 F.3d at 1247, 1252–53.

One point before applying *Burchett* and *Crocker* to Mr. Nutt's detention: Defendants insist that Officers Aguirre and Solis are not responsible for Mr. Nutt's detention in the patrol unit because they did not place him there. ECF 48 at 24–25. Not so. "Liability under § 1983 requires personal participation in the unlawful acts." *Beedle v. Wilson*, 422 F.3d 1059, 1072 (10th Cir. 2005). An officer personally participates by failing to intervene when another officer is unreasonably detaining a suspect in a hot car. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008) (explaining that a failure to intervene theory can apply to a Fourth Amendment excessive force claim); *Burchett*, 310 F.3d at 945–46 (reasoning that a hot car theory is a Fourth Amendment excessive force claim).

Here, Officers Aguirre and Solis watched Officer Quinones—at Officer Hayes's directive—place Mr. Nutt in the patrol unit, and they remained on scene. UFs 14, 18. Thus, while they did not place Mr. Nutt in the patrol unit, if Mr. Nutt's detention was objectively unreasonable under a hot car theory, Officers Aguirre and Solis would be liable under a failure to intervene theory.

Mr. Nutt's detention in the patrol unit, however, was not objectively unreasonable because it minimally intruded on his Fourth Amendment protected interests, caused minimal harm, and Mr. Nutt's conduct elevated the government's interest in seizing him. *See Crocker*, 995 F.3d at 1250–52; *Burchett*, 310 F.3d at 945–46. To be sure, the heat favors Mr. Nutt's position. Construing the facts most favorably to Mr. Nutt, the Court presumes that July 6, 2023, was hot in Las Cruces at around noon. While Mr. Nutt presented as old, told officers he was sick, and eventually told officers he was a Vietnam Veteran [UFs 19–20], these facts do not necessarily make his detention unreasonable. The remaining facts, however, favor Defendants' position. Mr. Nutt sat in the patrol unit for roughly forty-five minutes. UF 14. Officers acted reasonably by calling EMTs and

detectives soon after Mr. Nutt's takedown. *See* UFs 14, 15. They checked on Mr. Nutt several times and offered him water after he complained of dehydration. UF 14. Mr. Nutt spent ten of the forty-five minutes standing next to the patrol unit while EMTs confirmed his good health. *Id.* Mr. Nutt's erratic, uncooperative, and confrontational manner elevated the government's interest in detaining Mr. Nutt in the patrol unit to prevent him from disrupting the investigation. UFs 9–11. Additionally, the Court cannot find record evidence from which a reasonable trier of fact could conclude that Mr. Nutt suffered a heat-related injury. Most importantly, the patrol unit was running with the air-conditioning on. Given the heat of the day, Mr. Nutt's behavior, and the government interest in searching Mr. Nutt's house, the air-conditioned patrol unit was the most reasonable place to detain Mr. Nutt. Accordingly, detaining Mr. Nutt in the patrol unit was not objectively unreasonable.

If detaining Mr. Nutt in the patrol unit was objectively unreasonable, however, Officers Aguirre and Solis would still be entitled to qualified immunity because they did not violate clearly established law. Mr. Nutt has not identified, and the Court has not found, on-point Supreme Court or Tenth Circuit precedent holding that an officer acts unreasonably by detaining a suspect in an air-conditioned patrol unit for forty-five minutes on a hot day. Again, *Burchett* and *Crocker* prove informative. In *Burchett*, the court reasoned that Supreme Court precedent clearly established that the Fourth Amendment right against unreasonable seizures includes a right to be free from detention in extreme heat. *Burchett*, 310 F.3d at 945 (citing *Hope*, 536 U.S. at 737). The District of Colorado, though, observed that *Burchett* and *Hope* involved individuals exposed to extreme heat for several hours. *Sequeria v. McClain*, No. 15-CV-2587 PAB/MEH, 2017 WL 1197296, at *8 (D. Colo. Mar. 31, 2017). That court thus reasoned that *Burchett* and *Hope* did not clearly

establish a right to be free from detention in extreme temperatures for a shorter period. *See id.* at *7–8.

This Court agrees with the court in *Sequeria*: the constitutional principles explained in *Burchett* and *Hope* did not clearly establish a right to be free from detention in an air-conditioned patrol unit on an extremely hot day for forty-five minutes.[19]

Moreover, in *Crocker*, the court found that detaining a suspect for up to thirty minutes in a patrol unit without air-conditioning on an eighty-four-degree day was not a clearly established Fourth Amendment violation, reasoning that it had only once before decided a hot car case. *See Crocker*, 995 F.3d at 1252. Here, the Tenth Circuit would likely reach a similar conclusion.

Another point from *Crocker* bears on the qualified immunity analysis: that court worried about making a lawsuit out of every hot car incident in the states of the Eleventh Circuit—Alabama, Florida, and Georgia—where uncomfortable heat is a fact of life. *See id.* at 1245, 1252. New Mexico gets similarly hot. A decision expanding liability for hot car detentions would lead to more lawsuits being filed in New Mexico. The Fourth Amendment may well provide greater protections than the law currently recognizes for suspects detained in patrol units on excessively hot days. But qualified immunity principles prevent this Court from holding Officers Aguirre and Solis liable without them having been placed on notice by the Tenth Circuit or the Supreme Court.

Construing the facts in the light most favorable to Mr. Nutt, the Court concludes that Officers Aguirre and Solis did not use excessive force when they took down, handcuffed, and placed Mr. Nutt in the patrol unit. No reasonable trier of fact could conclude otherwise; therefore,

---

[19] The dearth of hot car cases decided by the Supreme Court and Tenth Circuit, along with the facts that officers checked on Mr. Nutt repeatedly and detained him in the patrol unit for forty-five minutes, mean that Officers Aguirre and Solis would be entitled to qualified immunity based on the second prong even if the patrol unit was not air-conditioned.

Defendants are entitled to judgment as a matter of law on the claim that the force used was unreasonable. The Court turns now to Mr. Nutt's ADA claims.

**B. Defendants are entitled to judgment as a matter of law on the Americans with Disabilities Act claims.**

The ADA prevents public entities from denying benefits on the basis of an individual's disability. 42 U.S.C. § 12132. In this section, the Court will explain the three reasons why Mr. Nutt's ADA claims fail: because (1) he was not a qualified individual with a disability; (2) his alleged disabilities did not cause Defendants' actions; (3) he fails to establish deliberate indifference by the City of Las Cruces.

1.  Mr. Nutt was not a qualified individual with a disability on July 6, 2023, because he did not have an impairment that substantially limited any major life activities.

To prevail on an ADA claim, the plaintiff must first establish that he or she is a qualified individual with a disability. *J.V. v. Albuquerque Pub. Schs.*, 813 F.3d 1289, 1295 (10th Cir. 2016). A qualified individual with a disability is one who has a recognized impairment that substantially limits one or more major life activities. 42 U.S.C. § 12102(1)(A); *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1142 (10th Cir. 2011). Impairments are not conditions that arise naturally in all persons; rather, impairments are permanent conditions that arise from physiological, mental, or psychological disorders. *See Carter*, 662 F.3d at 1142; *Sutton v. United Air Lines, Inc.*, 130 F.3d 893, 899 (10th Cir. 1997). Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Carter*, 662 F.3d at 1143 (quoting 29 C.F.R. § 1630.2(i) (2006) (amended 2011)). An impairment substantially limits a major life activity when it prevents or significantly restricts an individual's ability to perform that activity. *Id.*

Old age and the physical limitations it naturally imposes are not impairments under the ADA; rather, they are naturally arising conditions common to all who live long enough to see them. *See Sutton*, 130 F.3d at 899. The ADA protects those with disabilities—a historically disadvantaged group that previously lacked statutory anti-discrimination protection—while excluding from its scope age discrimination. *See* 42 U.S.C. § 12101(a)(2)–(4). The elderly are not a historically disadvantaged group, and they have their own anti-discrimination statute. *See Kimel v. Fl. Bd. of Regents*, 528 U.S. 62, 82–83 (2000); 29 U.S.C. § 623.[20]

Consequently, Mr. Nutt's age and physical limitations alone are not impairments that could make him disabled under the ADA, a point Mr. Nutt admits. UF 23. The Complaint contends that Mr. Nutt suffers from "disabilities associated with [his] age" but does not elaborate on these alleged disabilities. ECF 1-1 at 10 ¶ 83. This contention merely disguises an age-discrimination claim as an ADA claim. The Court turns now to Mr. Nutt's medical conditions.

Mr. Nutt's physical condition does not make him a qualified individual with a disability under the ADA because he can point to no record evidence from which a reasonable trier of fact could conclude that his physical conditions substantially limit a major life activity.[21] *See Carter*, 662 F.3d at 1142–44. Mr. Nutt contends that he suffers from disabilities with strength. ECF 73. But Mr. Nutt does not point to a strength-related impairment that substantially limits a major life

---

[20] Defendants may wonder why the Court's analysis reaches this depth. After all, Mr. Nutt admitted he was not disabled. UF 23. The word "disabled" has different meanings depending on whether it is used in common conversation or as a legal term of art within the ADA. Mr. Nutt's confusion over his own disability status illustrates this point. *See* UF 23 (collecting sources). Construed in the light most favorable to Mr. Nutt, the Court finds that his admission that he did not have a disability is not an admission that he does not qualify for ADA protection. Thus, the Court must determine whether a reasonable trier of fact could find that Mr. Nutt meets the legal test for disability.

[21] Mr. Nutt's repeated insistence that his medical history be hidden from opposing counsel and the Court hurt his chances of surviving summary judgment on his ADA claims. Mr. Nutt chose to put his medical history at issue both by asserting ADA claims and by claiming personal injuries. ECF 1-1 at 12 ¶ 100. If he is to recover, a court will need to compare Mr. Nutt's medical condition before and after July 6, 2023, to fairly compensate him for his injuries. The Court could have balanced Mr. Nutt's legitimate interest in medical privacy against the need to compare his pre- and post-injury states by faithfully applying the Federal Rules of Evidence or considering a protective order. But Mr. Nutt did not give the Court that opportunity.

activity. Mr. Nutt further insists that he suffers from a fractured vertebra that Officers Aguirre and Solis reaggravated. UF 21. No reasonable trier of fact could conclude that Mr. Nutt's physical symptoms—joint and neck pain—substantially limit a major life activity. UF 21. The severity of this condition is supported only by a likely inadmissible hearsay statement from Mrs. Nutt. ECF 105-1. To this point, Mr. Nutt confuses a (speculative) injury arising from his claims with a disability discrimination claim.

Similarly, Mr. Nutt's mental condition does not make him a qualified individual with a disability under the ADA for the same reason. *See Carter*, 662 F.3d at 1142–44. Mr. Nutt's contention that he suffers from "disabilities associated with being a military veteran" are without merit because Mr. Nutt suffered no injuries during his miliary service. *See* UF 20 and accompanying footnote. Mr. Nutt receives mental health treatment [UF 22], but he does not present evidence from which a reasonable trier of fact could conclude that his mental health conditions substantially limit a major life activity.

Mr. Nutt contends that the Court and Defendants' counsel have failed to make reasonable accommodations for his alleged disabilities throughout this litigation.[22] *See, e.g.*, ECF 108. This contention, however, is not before the Court in a manner compliant with the Federal Rules of Civil Procedure or the Local Rules of this Court. The Complaint's ADA claims are limited to events occurring on or before July 6, 2023. ECF 1-1 at 9–12 ¶¶ 79–97. Any alleged failure to accommodate Mr. Nutt's disabilities after that date is irrelevant to those claims.

---

[22] This contention focuses on Mr. Nutt's hearing and balance issues, which, as the Court explained, became serious only *after* the events described in the Complaint.

2.  <u>Mr. Nutt's Americans with Disabilities Act claims fail because Officers Aguirre and Solis did not discriminate against Mr. Nutt based on his alleged disabilities.</u>

An ADA plaintiff must demonstrate that he or she was excluded from participation in, denied the benefits of, or otherwise faced discrimination from a public entity because of his or her disability. *J.V.*, 813 F.3d at 1295. The ADA applies to police detentions. *Torres v. City of Albuquerque ex rel. Albuquerque Police Dep't*, No. 12-CV-1048 RB/KBM, 2015 WL 13662387, at *18 (D.N.M. Apr. 22, 2015) (citing *Gohier v. Enright*, 186 F.3d 1216, 1220–21 (10th Cir. 1999)). Police could discriminate against a disabled detainee in one of two ways. *Gohier*, 186 F.3d at 1220–22. The first occurs when police wrongfully detain a person with a disability either because of that disability or after mistaking the effects of the disability for criminal activity. *Id.* at 1220; *J.H. ex rel. J.P. v. Bernalillo Cnty.*, 806 F.3d 1255, 1260 (10th Cir. 2015). The second occurs when police fail to make reasonable accommodations for a person's disability during a detention, causing that person to suffer greater injury or indignity than other detainees. *Gohier*, 186 F.3d at 1220–21 (citing *Gorman v. Bartch*, 152 F.3d 907, 912–13 (8th Cir. 1998) for the proposition that this theory is viable).

By way of example, the Eighth Circuit held in *Gorman v. Bartch* that the wheelchair bound plaintiff raised a triable issue of fact as to whether the defendant-officers discriminated against him on the basis of disability by detaining him in a patrol unit without a wheelchair lift or restraints. *See Gorman*, 152 F.3d at 909–10, 913–14. The Tenth Circuit has clarified that to survive summary judgment, a plaintiff alleging this theory must provide admissible evidence that he or she requested an accommodation for a disability, or that the plaintiff obviously needed an accommodation. *J.H. ex rel. J.P.*, 806 F.3d at 1261 (citing *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1196 (10th Cir. 2007)). Moreover, the Tenth Circuit has declined to adopt a rule categorically excluding police detentions from the ADA's scope, but it has not expressly adopted either of these

30

two potential theories. *See, e.g.*, *Gohier*, 186 F.3d at 1221; *J.H. ex rel. J.P.*, 806 F.3d at 1260–62. Even if these theories were viable, they do not apply to Mr. Nutt's case, for at least two reasons.

First, Officers Aguirre and Solis did not detain Mr. Nutt because of his alleged disabilities or after mistaking the effects of his alleged disabilities for criminal activity. As explained, Officers Aguirre and Solis detained Mr. Nutt because they had reasonable suspicion that he had committed aggravated assault and they had a reasonable basis to believe that handcuffing, taking down, and placing Mr. Nutt in the patrol car were necessary to maintain the status quo during their investigation.

Second, the officers did not fail to reasonably accommodate Mr. Nutt's alleged disabilities while detaining him because Mr. Nutt neither requested an accommodation for his alleged disability, nor was the need for an accommodation obvious. *See J.H. ex rel. J.P.*, 806 F.3d at 1260–62; *Gorman*, 152 F.3d at 909–10, 913–14. Mr. Nutt does not contend that Officers Aguirre and Solis denied his requested accommodations for his alleged disabilities, nor could he, for Mr. Nutt did not make such a request. Mr. Nutt stated that he was "sicker than a dog," but no reasonable trier of fact would consider this to be a request for accommodations. *See* UF 20. To be sure, Mr. Nutt requested water, to have his handcuffs removed, and to be allowed inside his house. But these are requested accommodations for thirst, discomfort, and heat, not for an alleged disability. Moreover, Mr. Nutt's alleged disabilities did not make the need for an accommodation obvious. The only conditions obvious to Officers Aguirre and Solis were physical limitations associated with Mr. Nutt's age [UF 19], which the Court explained are not disabilities. Mr. Nutt's insistence that he told Officers Aguirre and Solis that he was a Vietnam Veteran and that he suffered obvious symptoms of disabilities associated with military service is without evidentiary support and, in any event, did not make the need for accommodation obvious.

3. Mr. Nutt's failure to train and supervise claims under the Americans with Disabilities Act fail because he has not provided evidence of deliberate indifference.

The Tenth Circuit has neither recognized nor rejected a failure to train claim under the ADA. *See J.V.*, 813 F.3d at 1297; *Gohier*, 186 F.3d at 1222; *A.V. ex rel. Hanson v. Douglas Cnty. Sch. Dist. RE-1*, 586 F. Supp. 3d 1053, 1067 (D. Colo. 2022). If the Tenth Circuit were to recognize such a claim, however, it would require an underlying ADA violation by an individual defendant and a showing of deliberate indifference by the municipality. *See J.V.*, 813 F.3d at 1297; *Sperry v. Maes*, 592 F. App'x 688, 698 (10th Cir. 2014) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390, 397 (1989)). In the ADA context, a municipality would act with deliberate indifference if it was placed on notice of the need to change its training on detaining those with disabilities but decided not to. *See Sperry*, 592 F. App'x at 698.

Here, even assuming the viability of a failure to train claim under the ADA, Mr. Nutt's claim fails. First, as explained, Officers Aguirre and Solis did not violate Mr. Nutt's rights under the ADA. Second, Mr. Nutt has not presented evidence from which a reasonable trier of fact could conclude that the City of Las Cruces was placed on notice of the need to change its training on detaining those with disabilities.

Construing the facts in the light most favorable to him, the Court concludes that Mr. Nutt was not a qualified individual with disabilities at the relevant time, and, in any event, Officers Aguirre and Solis did not discriminate against Mr. Nutt based on his alleged disabilities. Moreover, the Court concludes that the City of Las Cruces was not on notice of the need for more training. No reasonable trier of fact could conclude otherwise; therefore, Defendants are entitled to judgment as a matter of law on Mr. Nutt's ADA claims.

**C.  The Court declines to exercise supplemental jurisdiction over the remaining state law claims.**

Generally, a district court "shall have supplemental jurisdiction over all other claims that are so related to claims … within [the court's] original jurisdiction that they form part of the same case or controversy."  28 U.S.C. § 1367(a).  Nevertheless, "[t]he district courts may decline to exercise supplemental jurisdiction over a claim … if … the district court has dismissed all claims over which it has original jurisdiction."  § 1367(c).  Consequently, "[a] district court, upon dismissing Plaintiff's federal claims, [does] not abuse its discretion by declining to exercise supplemental jurisdiction over [his] state law claims."  *Strain v. Regalado*, 977 F.3d 984, 997 (10th Cir. 2020) (also observing that supplemental jurisdiction "is a doctrine of discretion, not of plaintiff's right" (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966))).  In fact, "if the federal claims are dismissed before trial … the state claims *should* be dismissed as well."  *Id.* (emphasis added) (quoting *Gibbs*, 383 U.S. at 726).  Although the Court appreciates the impact on judicial economy and the additional expense of possible continued litigation, the Court considers itself bound by the Tenth Circuit's strong preference that "if the federal claims are dismissed before trial … the state claims should be dismissed as well."  *Strain*, 977 F.3d at 997.  Consequently, the Court will decline to exercise supplemental jurisdiction over Counts I-IV.

## V.  CONCLUSION

For the foregoing reasons, the Court holds that Defendants are entitled to summary judgment with respect to Nutt's federal constitutional and ADA claims.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Partial Summary Judgment No. 1 [ECF 48] and Defendants' Motion for Partial Summary Judgment No. VII [ECF 55] are **GRANTED**.

**IT IS FURTHER ORDERED** that Counts V, VI, and VII in the Complaint [*see* ECF 1-1 at 9–12 ¶¶ 74–97] are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the remaining state law claims in Nutt's Complaint— Counts I, II, III (failure to train and/or supervise in violation of the New Mexico Tort Claims Act), III [sic] (unreasonable seizure in violation of the New Mexico Civil Rights Act), and IV (failure to train and/or supervise in violation of the New Mexico Civil Rights Act) [*see* ECF 1-1 at 5–9 ¶¶ 43–73] are **REMANDED** to the Third Judicial District Court of the State of New Mexico because the Court **DECLINES** to exercise supplemental jurisdiction over them.

**IT IS FINALLY ORDERED** that all other motions pending on the docket at the time this Memorandum Opinion and Order was filed are **DENIED** as moot.

**SO ORDERED.**

THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
***Presiding by Consent***

34